Good morning, Your Honors. My name is Vicki Buchanan. I'm here on behalf of Robert Jackson. Robert Jackson, I would like to reserve two minutes. Robert Jackson was a first-time non-violent drug offender with a minor role who is now facing, perhaps for him, a life sentence because of the government's breach of the plea agreement. The undisputed procedural facts are, Robert Jackson entered into a plea agreement in which the government agreed that he met the first four prongs of the safety valve under 18 U.S.C. 3553F, including the part where he was, where they admitted that he was not an organizer, a leader, or a manager. He met with the government, he gave a truthful, proper statement on June 3rd, and at a hearing on June 30th, he appeared before the judge. The government was not quite prepared at that time, but the judge specifically asked, did Mr. Jackson meet the fifth prong? Did he meet with you? Did he provide you with complete, truthful information? And the answer was yes. We will recommend the safety valve. At the subsequent sentencing hearing on September 15th, the government not only reneged on the position of the safety valve prong 5, at this time they said, based on the information Mr. Jackson gave at his first proffer session on June 3rd, we believe that he gave us information that makes us think he might have been an organizer, leader, or a manager. And the judge took that seriously. So she kept sending him back for more proffer sessions. But at that point in time, as of September 15th, Robert Jackson believed he had the safety valve. Now, I believe the Court got diverted, but under the case of United States v. Shrestha, which Justice Nelson is familiar with, he did testify as a matter of law by the government's sentencing, and therefore was, as a matter of law, entitled to the safety valve. If, in fact, it was a factual setting, and that's what was raised in our supplemental briefing, is if, indeed, it is a factual issue, based on the State of Blakely, which is probably changing as we speak, he is entitled to have a jury determine whether or not he met the fifth prong of the safety valve. It's a substantial difference for him. He's been sentenced to the mandatory minimum of 120 months. With the safety valve, he'd be entitled to 70 months. In addition to your position there, I find an interesting one, which is that if, say, the district court properly arrives at a sentencing range given the verdict to the jury, and then there's a potential reduction for, say, acceptance of responsibility or safety valve, it's your position that those facts have to be found by a jury also, even though it's a reduction from the sentencing range? It's because if you're looking at the safety valve, which is mandatory, it's not a discretionary thing. If the five factual findings are made by the judge, then the statute requires that there be a – they be sentenced below the mandatory minimum. It's certainly not the same as what we're dealing with in Blakely, which is an enhancement, per se. But it's also a nondiscretionary factual finding which alters sentencing expectations, which is part of the Blakely decision. So if, indeed, it does have to be a factual finding and not as a matter of law because the government already admitted that he did testify truthfully at some point before the – the sentencing hearing, then it's my position that under the current state of the law with Blakely and Anaheim, that he would be entitled to go back and have a jury decide whether or not he did, in fact, testify truthfully. So it's your thought that the sword ought to cut on both sides? Pardon? The sword should cut on both sides, up and down. Exactly. Okay. And it's important that not only was it the 70-month difference, which is substantial, it's almost 4 years difference, but Mr. Jackson definitely has a case that's outside the heartland. When he came back for sentencing on September 15th, he believed he was coming in for downward departures based on substantial health problems and based on a very odd situation where he was represented by an imposter lawyer for the first five months of his incarceration, a time when he could have possibly even gotten substantial assistance departure. And as the Court is aware, he has difficult health issues. He has no kidneys. He requires dialysis three times a week. He has an enlarged heart. He has arthritis. He has high blood pressure and is blind in one eye. And I believe that the government, by its breach, and it was an obvious breach, challenged the integrity of the judicial system, and Mr. Jackson really deserves to be resentenced. Thank you. Do you want to reserve? Did you want to reserve some time? One minute. Okay. Good morning, Your Honors. Craig Mazzocchi on behalf of the United States. May it please the Court, I'd like to begin by addressing three of the points that Ms. Buchanan just made. First, I think it's important to remember, although the government concedes that it made a statement that was not in compliance with the plea agreement, that's a given. But I think it's important to remember that at the time the government entered into the plea agreement, it was before Mr. Jackson had come in to make his first proper session. So we had agreed to the first four before we received the information that he was a babysitter or a mentor while his half-brother was in North Carolina. The second point I'd like to respond to is Ms. Buchanan What difference does that make? Well, I think it goes to the issue of intent here. I mean, the statement was a mistake. It was not something that was intended to challenge the integrity of the judicial system. I just think it's important to have the chronology correct, that we didn't have that information at the time we entered into the plea agreement. But you still made a promise to Mr. Jackson that he would get the benefit of that And with respect to why the Court did not keep sending Mr. Jackson back for additional proper sessions, as Ms. Buchanan suggested, the Court wanted to give Mr. Jackson every opportunity to take advantage of the safety valve. And what happened here, he made a proffer in early June, he made another proffer in early August, at which point he took everything back. Not only did he take everything back, but he said he never said many of the statements he said. And the judge, recognizing this, wanted to give him as many opportunities as he needed. So he received another opportunity where he came into our office and proffered, and then the judge allowed him to get on the stand and testify in court in front of the judge herself. So it wasn't that the judge was sending him back because of the government's breach. It was the judge wanted to give him every opportunity to come clean. Lastly, with respect to the suggestion that the government admitted that the defendant's first proffer in early June was truthful, that's not true. The government agreed at the first sentencing hearing that he probably qualified for safety valve, that he met all five criteria. But the government, later on, after he took back all his statements, said he had never made them and made other statements. How does this relate to the promise in the plea agreement? Oh, I agree, Your Honor, that it has nothing to do with that. The government made a statement. It said something important. Well, if you're stipulated to that, so now you're putting somebody on the stand or somebody who's taking the stand because of the fact that the government is now saying, no, that isn't the stipulation. All of the testimony really related to his having to defend something he should not have had to defend. Your Honor, I would agree that if the only issue, if the only point on which there was a contention was his role while his brother was in North Carolina, that was the only issue on which we had a doubt about his credibility, and that was the only reason he got on the stand to testify, then we might have an issue here. But that wasn't – that's not what happened. That was one of the many issues. Well, but as Judge Wardlaw pointed out, how about the promise? I agree, Your Honor. And before he was sentenced, the government withdrew the suggestion he had made. It's too late, because he's already been put on the stand to testify about stuff he didn't have to. Well, it did come after he testified, but I would like to point out that his lawyer pointed it out to the Court before he testified, and there was some suggestion that he knew about the representation in the plea agreement before he made his third proffer. So I believe that gave him a license to get on the stand and tell the truth, albeit the government withdrew the argument after he testified. But as I said, that was not the only point on which he did not tell the truth. There were several others, and the Court's ruling made it very clear that she found him not to be credible on a number of different grounds, not even including that one.    But if you look at these events, I mean, the first continuation wasn't even for a proffer. It was to gather more information about his health. Well, I think it was the primary reason. The Court did not have sufficient information about his health. Exactly. So he never would have had to go back and give the second and third proffer, or even the first proffer. No, I'm not saying that. I'm saying the briefs did not occur until well after the second proffer, at which time he took back everything he said and accused the agents of lying about what was in the first proffer. Right. And apparently he was being a little hostile, and there were other issues that were going on. But does the government agree that his first proffer was truthful? It argued the first proffer to the Court. No, Your Honor. The government cannot agree that the first proffer was truthful based on everything he said after that. But everything he said after that was not true. And I might point out, it's he made additional statements outside of his first proffer at the very last time when he testified before the Court, which not only contradicted the first proffer, it contradicted statements he admitted at his plea change of plea colloquy and in his plea agreement. For example, that there was no conspiracy, that there were just these were just freelancers. And those things went to the core issues in the case, and those occurred irrespective of the government's breach. Which, as I pointed out, occurred after the second proffer where he took back everything. Once he took back everything at that second proffer, the government had no way of knowing whether or not he was telling the truth at the first proffer or not. Took back everything. Took back everything. And that was conceded by his counsel. Specifically what? Everything he said. Specifically that he babysat the organization while his brother was in North Carolina. Specifically that he was there. And he didn't have to testify on any of that if the government had observed its promise in the agreement. No, Your Honor. The breach of the plea agreement occurred after the second proffer. The chronology was first proffer, second proffer where he takes everything back and accuses the agent of lying, and then third, then the breach occurs after that second proffer. So the government had done nothing to to that prompted him to take back everything and accuse the agents of lying. That occurred afterwards. Do you have anything further? Oh, there's just a couple of points I would like to make, if I may. The primary issue here, I believe, is whether or not the government can cure an inadvertent breach of a plea agreement. And I think the – although I wasn't able to find a case exactly on point, I did cite several cases to the Court that appeared to assume that a breach can be cured. And I think there's good reason for that. One, it would be consistent with standard contract principles, which appear to apply to plea agreements. And two, while I think it's important that – critically important that the defendant receive everything he is entitled to under a plea agreement, I believe he received that in this case. The Court made very clear by its ruling that it was not taking into account the government's misstatement. And the Court found several other reasons why the – she could simply not find that the defendant was being truthful with the government. And I think under the clear error standard, it would be difficult to say that she made a mistake after she had a chance to observe him in court, testifying, heard his testimony, heard him contradict things in his own plea agreement, heard him contradict things that were virtually givens in the case. Under those circumstances, the government would simply ask that the Court affirm the district court's ruling. Thank you. Thank you. Just briefly, I don't know how much clearer the government could have been on September – I mean, on June 30th, the Court asked what the position was with regard to the safety valve. The attorney's office answered that it would apply, that that would apply, that he has come in and talked to us. But I understand that he is not – there has not been a 5K issue anymore because he's not going to be testifying. The Court, all right. So let me make sure I understand the government's position. If you had filed something before today, you would have agreed he is eligible for the safety valve, but not for the 5K1 letter. The government, correct. What happened was Mr. Jackson's attorneys decided they have the safety valve. What harm is going to come from trying to get the 5K letter? Robert Jackson did not want to do the 5K letter, but his attorney coaxed him to do it. So you're saying that's an in-court admission and the government from that point on is factually bound to stand right there? I believe so. He's – there is an estoppel here. If I was representing him, I'd say, you've cleared the safety valve. You know, what do you have to lose if you go in and the government – you have nothing helpful for the government to testify about the remaining two or three people out there. You know, you've already got the safety valve. That's done. So when the hearing came up on September 15th, I'm sure his attorney felt blindsided by all of a sudden the change. Now, not only was it not the safety valve, but they're saying based on his June 3rd proffer, that he is now an organizer, a leader, and a manager, and judge – the judge believed, you know, that that might be substantial. But the government had that information about what he did with his brother in North Carolina, South Carolina, at the time that they – that the attorney Carden said, yes, he deserves the safety valve. So – Is that the – is that the end of the issue, though? In other words, doesn't the final decision have to be made by the judge? Absolutely. It has to be – The judge hears the parties. One of the parties may admit factually that all five elements are met, and then facts come into the record that tell the district judge the defendant isn't being truthful. Isn't that the point at which the safety valve comes into play? That would be the point at which it came into play if the – if they had not already been before the Court. No, but that – but the question is, the district judge makes that decision. The parties don't do it by agreement in this case. They left that open. The U.S. attorney made a mistake or – or not and said that the fact – factors have been met. The case goes forward, and the district judge gets convinced the defendant is not telling the truth. Doesn't that end the safety valve argument? That would be if there was – if there was – if, for instance, the judge had then held a hearing on September – I mean, on June 30th, and there had been a hearing like, okay, now I want you to take the stand or something, but at a practical level, the judge would have taken the government's recommendation, because the judge isn't there. They don't have a hearing every time that someone makes a proffer to the government. The government comes in and says, yes, we think he testified truthfully to us. And as a practical matter, the judge relies on that. Now, if there's a factual issue that comes in where the government had come in and said, we don't think he was truthful here, Your Honor – So you're saying it's not binding but? Pardon? It's not binding on the court but. In this case, it is. Well, it – Wasn't the continuance to look into the departure for health reasons? Yes. And that's when the – when the other facts come forward. Well, actually, the facts would not have come forward on the health issues if his lawyer hadn't said, let's go in and talk to the government one more time to see if we can get an additional two-level reduction for substantial assistance, which would be to testify against other possible co-conspirators. So not only the useful – the complete and truthful statement that's required for the safety valve, but to go one step further, does he have any information that would be helpful to the government in prosecuting other people still to stand trial in this case? Mr. Jackson didn't want to do that, but he went in. And so when he sat down for that particular proffer session, he had a case of amnesia. He forgot everything he'd said in his original proffer. But at that point in time, he was relying on what the government had said, that he had a safety valve on the initial sentencing. And under the case law, under Shastra and Carpenter, that's all he needed to do at that point in time. So your view is that if he changes his story, depending on whether or not he has risk from the story he's telling, that that's truthful? No, I'm not saying that he was truthful after that time, no more than the defendant was in Shastra. They talked about having had carabinic courier and carrying drugs into the country when they gave their first statement, and on the stand, he denied having any information on having any drugs at all. That wasn't truthful. But for purposes of the safety valve, he had at one point in time truthfully given information. Whereas there's absolutely no doubt that Mr. Jackson gave a complete, truthful statement, as outlined in the government's brief, of everything he laid out. He was a low-level person in this particular transaction. He had almost nothing to do with it except for one possible phone call. And he told them everything he was supposed to. His attorney came to the hearing, and at that point in time, the government said, yes, we believe he's told us everything truthful. It's not required under the safety valve that the information is something that you can prosecute on, which would certainly be a problem if it was a high-pay proffer and all of a sudden he went up on the stand and changed his entire story. That would certainly defeat a 5K proffer, but not the safety valve that he already believed that he was entitled to at that point in time, and that all that really remained was the health issues. Well, to get the safety valve reduction, he was not required to testify in court. Correct. And it was the agreement was that he would talk to the government, and then the government would decide whether that proffer where he gave the information was truthful or not. Yes. And once the government made that representation to the court that it was truthful testimony, then all five prongs would have been met. That's my opinion, that as of June 30th, he met the safety valve as a matter of law. But did the government ever say to the court that he was truthful in the first proffer? Not directly, except for what the court, what I just read to the court, what is the government's. So you met the requirements, all five. Yes. So that would be an implied statement to that effect. Correct. And after that, once he had met all five, the court, does it have discretion or not to grant the safety valve? I would imagine that the court has, you know, the ability to make the factual findings if there's any in dispute. But I don't – I just can't practically imagine why a court would delve into the factual findings if all parties agreed that the five prongs had been met. It seems like an odd case, because none of this would have happened if the first sentencing hearing hadn't been continued so that he could get evidence about his health. Exactly. And the government could look into the two requested departures. All right. Okay. Thank you. Does anyone else have any more questions? All right. Thank you very much, counsel. Thank you. All right. U.S. v. Jackson is submitted, and we will take up Beltran v. Rowe.
judges: Hug, T.G. Nelson, Wardlaw